PERRY G. BURDETTE ET AL. *v.* VINCENT
J. LaSCOLA ET UX.

[No. 245, September Term, 1978.]

*Decided December 7, 1978.*

The cause was argued before GILBERT, C. J., and MOORE and LOWE, JJ.

*James F. Martin* for appellants.

*Robert R. Michael* for appellees.

GILBERT, C. J., delivered the opinion of the Court.

This appeal is concerned with the effort by the Peoples Lumber and Supply Company, Inc., (Peoples), appellant, to avoid financial responsibility under a "completion bond" that it signed on behalf of a builder, Perry G. Burdette, another appellant. The question before us is who is the obligee under the bond. Before undertaking to resolve the issue, a brief history of surety law is in order so as to comprehend better the matter.

Suretyship commenced with the beginning of civilization.[1] References to suretyship are found in the Bible.[2] Although there is evidence of a surety contract as far back as 2750 B.C.,[3] and in the Code of Hammurabi, about 2250 B.C., the earliest written contract of suretyship that has been found dates to 670 B.C.

By the year 150 A.D., the Romans had developed "a highly technical law of suretyship." [4]

The concept of a corporate surety did not evolve in this country until the late 19th Century.[5] The delay in the development of corporate surety may have been related to the fact that the United States, prior to the latter half of the 19th Century, was primarily an agricultural country.[6] It was not

---

1. Jules Backman, *Surety Rate-Making: A Study of the Economics of Suretyship* 1, (The Surety Association of America, 1948).
2. Genesis 43:9, 44:32; Proverbs 6:1, 11:15, 17:18, 20:16.
3. J. Backman, *Surety Rate-Making: A Study of the Economics of Suretyship, supra,* note 1.
4. *Id. See also* W.D. Morgan, "The History and Economics of Suretyship," *Cornell Law Quarterly,* Vol. 12, pp 153-171 (1927).
5. J. Backman, *Surety Rate-Making, supra* note 1.
6. *Id.* at 2.

until the Industrial Revolution that the corporate surety emerged.[7]

With the emergence of the corporate surety as a business entity, judicially created rules of interpretation of surety bonds came into being. Two of those rules, and the two with which we are most directly concerned in the matter before us, are 1) "to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles." *Walsh v. Jefferson Federal Savings & Loan Association,* 216 Md. 131, 137, 139 A. 2d 847, 850 (1958). *See also Levy v. Glens Falls Indemnity Co.,* 210 Md. 265, 273, 123 A. 2d 348, 352 (1956); *Lange v. Board of Education,* 183 Md. 255, 260, 37 A. 2d 317, 320 (1944); *Hospital for Women v. United States Fidelity & Guaranty Co.,* 177 Md. 615, 619, 11 A. 2d 457, 459 (1940). 2) The old doctrine of favoring the surety by construing strictly a claim against him does not apply to the business surety. Its liability is to be interpreted liberally. *Hospital for Women v. United States Fidelity & Guaranty Co.,* 177 Md. at 618-19, 11 A. 2d at 459. *See also Lange v. Board of Education, supra; American Fidelity Co. v. State,* 128 Md. 50, 56, 97 A. 12, 14 (1916); *State v. National Surety Co.,* 126 Md. 290, 293, 94 A. 916, 917 (1915); *Aetna Indemnity Co. v. Waters,* 110 Md. 673, 699, 73 A. 712, 722 (1909); *Smith v. Turner,* 101 Md. 584, 587, 61 A. 334, 336 (1905).

For the reasons hereinafter set forth, we think the appellant, Peoples, while admittedly not engaged in the surety business, was, nevertheless, a surety for profit in the instant case. We shall, therefore, liberally construe the bond. *Walsh v. Jefferson Federal Savings & Loan Association,* 216 Md. at 137, 139 A. 2d at 850; *Hospital for Women v. Fidelity Guaranty Co.,* 177 Md. at 618, 11 A. 2d at 459; *Lange v. Board of Education,* 183 Md. at 260, 37 A. 2d at 320.

On March 15, 1973, appellees, Vincent J. LaScola and his wife, Lucy, entered into a contract with appellant, Perry G. Burdette, who agreed to build a home for $89,863 on land which the LaScolas owned in the Mt. Airy area of Frederick

---

7. *Id.* at 3.

County. Although the contract contained no completion date or provisions relating to completion, the LaScolas received the impression from John Burdette, the builder's foreman, that the house would be completed in six months.

The financial transactions involved were succinctly set out in the opinion of the trial judge:

> "The LaScolas financed the construction of their house by means of the proceeds of a $60,000.00 loan from Farmers and Mechanics National Bank plus $29,863.00 of their own capital, all of which was held by the bank in an escrow account. As the work proceeded, the bank issued draw checks which were made payable to LaScola, the builder and [Peoples,] the surety. LaScola and the surety endorsed the first four draw checks totalling $71,880 to the builder. After that, when it became apparent the work was not progressing because subcontractors had not been paid, Mr. LaScola used what was left in the escrow account, except for $187.53, to pay subcontractors [directly] in an effort to get the house finished. Furthermore, Mr. LaScola and his family . . . did a lot of the work themselves, and he paid out-of-pocket additional sums for labor and material."

Peoples became involved in the case as a surety as a result of their execution of a completion bond by their predecessor in interest, Peoples Lumber and Supply Company.[8] Farmers and Mechanics National Bank required such a bond as a condition precedent to its making a construction loan available to appellees. Before agreeing to act as surety, Peoples required Perry G. Burdette to pay approximately $40,000 of the $70,000 that he then owed to them for prior purchases of building materials and supplies. By so doing, Peoples became a surety for profit.[9]

---

8. The record indicates that Peoples Lumber and Supply Company was a sole proprietorship on May 31, 1973, when the completion bond was executed and that Peoples became incorporated on July 2, 1975.

9. This is so because they did receive $40,000 on the builder's account and, inferentially, would reap a profit by furnishing supplies to the builder in the instant case.

Matters did not proceed to appellee's satisfaction because Burdette did not complete the construction of the house. As a result, LaScola filed a "Bill of Complaint for Specific Performance and Other Relief" on August 8, 1974, in the Circuit Court for Montgomery County, Maryland. An initial order which directed Burdette to complete certain specified items was passed on February 5, 1976, and the case was continued with trial reset for July 6 and 7, 1976. The trial actually occurred on December 8 and 9, 1977. Judge Joseph M. Mathias filed his "Memorandum Opinion and Order" in the case on February 15, 1978. He awarded damages to the appellees as follows:

| | |
|---|---:|
| "For extra labor and materials, to complete the house (plus credit for items not installed) | $10,090.62 |
| For additional rent the LaScolas incurred by reason of the builder's unreasonable delay in completing the house | 912.50 |
| For expert witness fees | 1,535.00 |
| For attorney's fees | 8,585.00 |
| | $21,123.12 |
| Minus balance in escrow account | 187.53 |
| Net damages awarded in favor of plaintiffs against both defendants | $20,935.59" |

Peoples and Burdette noted an appeal where they pose five issues for our review. We shall discuss each in the order they have been put to us.

## I.

The threshold question presented by appellants is whether the chancellor erred in awarding judgment to the owners against the surety under the terms and provisions of the completion bond. The completion bond reads as follows:

"KNOW ALL MEN BY THESE PRESENTS, that we, P. G. Burdette, principal, and Peoples Lumber

Supply Company, surety, are held and firmly bound unto the FARMERS AND MECHANICS NATIONAL BANK, its successors and assigns, and Vincent J. LaScola and Lucy S. LaScola, his wife, as their interests may appear in the full sum of Eighty-nine Thousand, Eight Hundred Sixty-three ($89,863.00) Dollars, for which sum, we, jointly and severally, for ourselves, our heirs, administrators or executors, promise to pay to the said FARMERS AND MECHANICS NATIONAL BANK, its successors and assigns, and/or Vincent J. LaScola and Lucy S. LaScola, his wife, owners.

"WHEREAS, FARMERS AND MECHANICS NATIONAL BANK has agreed to make to Vincent J. LaScola and Lucy S. LaScola, his wife, owners as above, a loan in the sum of Sixty Thousand ($60,000.00) Dollars, secured by a first mortgage upon the following described real estate in Frederick County, Maryland:

Approximately fifteen (15) acre tract of land located on the east side of Penn Shop Road between Route 80 and Route 27

for the purpose of erecting thereon a dwelling, said loan to be payable in certain installments, which loan was made only upon the condition that the said owners as above, complete the said dwelling according to plans and specifications accompanying the application for said loan, and save harmless and protect the said FARMERS AND MECHANICS NATIONAL BANK against all liens for labor and/or material, which might be placed upon said property.

"AND WHEREAS, the said owners have contracted with the above named principal to complete said building, according to plans and specifications forming a part of said contract.

"NOW, THEREFORE, the condition of the above obligation is such, that if the said principal or

principals named above shall fully complete said dwelling according to said plans and specifications and save harmless and protect the said FARMERS AND MECHANICS NATIONAL BANK against all liens for labor and/or material, which may be filed against said property, including all costs, counsel fees, or other expenses incurred, that this obligation is to be void; otherwise, to remain in full force and effect."

Judge Mathias interpreted the bond as remaining in full force and effect until the principal (Burdette) satisfied the express condition requiring that he "fully complete said dwelling according to plans and specifications." Because the principal did not complete the house as promised, the surety, Peoples, was held to be liable under the bond.

We believe that Judge Mathias's decision is supported both by the language of the bond itself and by the applicable case law.

The obligation entered into was to be void "if the said principal or principals named above shall fully complete said dwelling according to said plans and specifications and save harmless and protect the said FARMERS AND MECHANICS NATIONAL BANK against all liens for labor and/or material, which may be filed against said property, including all costs, counsel fees, or other expenses incurred . . . otherwise [the obligation was] to remain in full force and effect."

The chancellor read the quoted language as containing two express conditions. One was that Burdette "fully complete said dwelling"; the other was to "protect the bank from lien claims."

The dwelling was not completed. *Ergo,* that condition was not fulfilled, and "the bond remained in full force and effect." Since the bond was not discharged, "the surety . . . [remained] liable under it."

The completion bond states that Peoples, as surety, is liable

both to Farmers and Mechanics National Bank and the LaScolas. The relevant portion of the agreement reads:

> "KNOW ALL MEN BY THESE PRESENTS, that we . . . *Peoples Lumber Supply Company, surety are held and firmly bound unto the FARMERS AND MECHANICS NATIONAL BANK . . . and Vincent J. LaScola and Lucy S. LaScola . . . [and we] promise to pay to the said FARMERS AND MECHANICS NATIONAL BANK . . . and/or Vincent J. LaScola and Lucy S. LaScola, his wife, owners."* (Emphasis supplied.)

The bond, as Judge Mathias observed, "might . . . properly be called a 'dual obligee bond.' See *Aetna Ins. v. Maryland Cast Stone,* 254 Md. 109, 113, [253 A. 2d 872, 874 (1969)]." In *Aetna,* the Court of Appeals had the opportunity to construe the language of a completion bond. The provisions of the bond involved in the *Aetna* case read as follows:

> " 'KNOW ALL MEN BY THESE PRESENTS, THAT we, GILBERT CORPORATION, Suite 903 World Building, 8121 Georgia Avenue, Silver Spring, Maryland (hereinafter called the Principal) and AETNA INSURANCE COMPANY, a Connecticut Corporation licensed to do business in the State of Maryland (hereinafter called the Surety) are held and firmly bound unto PARK HEIGHTS JOINT VENTURE (hereinafter called the Owner-Obligee) and MARYLAND NATIONAL BANK, Baltimore, Maryland 21203 (hereinafter called the Lender-Obligee), their successors and assigns as their respective interests may appear, as Obligees (hereinafter collectively referred to as Obligees), for the use and benefit of claimants as hereinbelow defined, in the sum of FOUR HUNDRED THOUSAND and no/100 DOLLARS ($400,000.00), lawful money of the United States of America, for the payment of which Principal and Surety bind themselves, their estate representatives, successors

and assigns, jointly and severally, firmly by these presents.

'WHEREAS, Principal has entered into a construction contract with Owner-Obligee dated the ⎯day of 1965, for the construction of EIGHT STORY APARTMENT BUILDING TO CONTAIN (28) TWENTY EIGHT UNITS, TO BE LOCATED AT 6000 PARK HEIGHTS AVENUE, BALTIMORE, MARYLAND, on Owner Obligee's premises at 6000 Park Heights Avenue, Baltimore, Maryland, in accordance with plans and specifications prepared by which contract, plans and specifications are by reference made a part hereof, as fully as if recited at length herein.

'WHEREAS, Lender-Obligee has agreed to lend to Owner-Obligee monies to be secured by a mortgage on the above mentioned premises of Owner-Obligee and to be used in making payments under said construction contract, and Lender-Obligee desires protection as its interest may appear in the event of default by the Principal under said construction contract with Owner-Obligee, said protection to be subject to the performance by the Obligees, or either of them, of the obligations to the Principal as set forth in said construction contract.

'NOW, THEREFORE, the condition of this obligation is such that, if Principal shall pay all persons who have contracts directly with the Principal for labor and materials furnished pursuant to the provisions of said construction contract, failing which such persons shall have a direct right of action against Principal and Surety under this obligation, and further that, if Principal shall cause all mechanics' liens filed by reason of non-payment for labor and material furnished in the prosecution of said construction to be discharged of record, then this obligation shall be null and void; otherwise, to

be and remain in full force and effect, subject, however, to the following express conditions:

'1.  The Principal and Surety shall not be liable to the Obligees, or either of them, unless the said Obligees, or either of them, make payment to the Principal or, in the event of Principal's abandonment of project or default, to the Surety, strictly in accordance with the terms of said construction contract as to payments, and perform all the other obligations to be performed under said construction contract at the time and in the manner therein set forth.

'2.  A claimant is defined as one having a direct contract with the Principal or with a subcontractor of the Principal for labor, material, or both, used or reasonably required for use in the performance of the contract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the Contract.

'3.  The above named Principal and Surety hereby jointly and severally agree with the Obligees that every claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed, or materials were furnished by such claimant, may sue on this bond for the use of such claimant, prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon. The Owner shall not be liable for the payment of any costs or expenses of any such suit.' " 254 Md. at 113-15, 253 A. 2d at 874-75.

In interpreting that language, the Court held that "[i]n effect, this bond is both a performance and a payment bond: It protects Park Heights and the Bank against non-performance by Gilbert, and protects subcontractors and materialmen against non-payment by Gilbert." 254 Md. at 116, 253 A. 2d at 875.

By comparison, the completion bond in the present case protects the LaScolas and the Bank against non-performance by Burdette, and it protects the Bank "against all liens for labor and/or material. . . ." It is, thus, both a performance and a payment bond involving dual obligees.

The bond is hardly a masterpiece of clarity. From the transcript we learn that the bond was prepared in the bank by a typist. Apparently, that person was given a form to copy. The use of forms is often an initial time-saver but a subsequent waster of time and money.

The general rule is that when a contract or bond is ambiguous [10] the Court must, if it can reasonably so do, ascertain the intent of the parties and give effect to that intent. *Walsh v. Jefferson Federal Savings & Loan Association,* 216 Md. at 137, 139 A. 2d at 850.

We think that is precisely what Judge Mathias did. Peoples "firmly bound" itself to the bank and to the LaScolas "in the full sum of Eighty-nine Thousand, Eight Hundred Sixty-three ($89,863.00) Dollars." Peoples expressly promised to pay that sum to the LaScolas or the bank if Burdette failed to perform his contract. Peoples, by undertaking the role of Burdette's surety, bound itself to pay for Burdette's shortcomings. In exchange for the payment of $40,000 on a past due account, and possibly additional profits from the sale of its wares to Burdette, Peoples ran the risk of Burdette's non-performance. They tied themselves, by the bond, to Burdette's fate and have to suffer the consequences.

We observe no clear error in the trial judge's finding of fact and no error in his application of the law thereto.

---

10. The appellants and the appellee agree that the bond is unambiguous. We have a different view, and despite what they agree to, there was a great deal of argument over what the bond language meant.

## II.

"Was the Chancellor ... [wrong in] holding the surety bound for damages arising out of the work performed under a substantial oral modification of the construction contract where the construction contract expressly provided that all modifications be made in writing? "

A preliminary hurdle must be cleared, *i.e.,* whether the oral modification was "substantial" as characterized by appellants or "immaterial" as claimed by appellees. The resolution of this question turns on the nature of the modification. It is established doctrine in Maryland that any change which materially alters the principal contract discharges the surety from liability. *Prodis v. Constantinides,* 167 Md. 33, 37, 172 A. 286, 288 (1934); *Chicago Bonding & Insurance Co. v. State,* 137 Md. 132, 135, 111 A. 772, 773 (1920); *Seventh Baptist Church v. Andrew & Thomas,* 115 Md. 535, 540, 81 A. 1, 3 (1911); *Aetna Indemnity Co. v. Waters,* 110 Md. at 698, 73 A. at 721; *Leppert v. Flaggs,* 101 Md. 71, 75, 60 A. 450, 451 (1905).

The doctrine applies regardless of whether "the construction contract expressly provided that all modifications be made in writing." Such a contract provision was contained in the *bond* involved in *Aetna.* It read: "The said surety must be notified in writing, and its written consent secured to, any change or alterations made in the original plans or specifications made by the obligee." 110 Md. at 697, 73 A. at 721. The change made in that case involved a verbal agreement allowing a $30 credit on the contract price because of the omission of a screen partition in the dining room of the building being constructed. "[I]n view of the proportion which the sum of $30 . . . is to the whole contract price of $13,506," the Court of Appeals held that "it might well be regarded as falling within the operation of the principle recognized by many authorities, that slight and immaterial changes in a contract which do not change its legal import will not release a surety." (Citations omitted). *Id.* at 698, 73 A. at 721.

In the case now before us, Judge Mathias did not

specifically address the question of the impact of the oral modification on the surety's liability. He did, however, include the damages claimed by appellees as a result of the collapse of the wall which was the subject of the oral modification.[11]

The surety denies liability for those damages. Appellants argue:

> "The surety does not contend the oral modification would operate as a total discharge.
>
> The only condition of the construction contract relating to changes and variances provides that such changes must be made in writing. No mention is made in the construction contract or completion bond which requires the consent of the surety. Although we must concede that the surety should have reasonably anticipated minor changes and variations, the surety is hard-pressed to find itself bound to such a substantial variation."

Whether the modifications concerning the wall which was the subject of the oral agreement were "minor" was a question of fact for the trial judge to determine. We cannot say that he was clearly erroneous in deciding implicitly that the modification was not a material alteration of the contract.

In determining whether the change was "material," the Court, in *Aetna,* looked to the proportion of the total contract price which was affected by the oral modification. In *Aetna,* the proportion was $30 out of a total of $13,506. In the present case, the modification involved a $700 addition to a contract price of $89,863. While proportionately slightly higher than in *Aetna,* the modification was not substantial. What was changed was merely the height, length, direction, and price of the wall; the wall itself was within the contemplation of the parties to the contract and referred to therein. The damages which resulted were occasioned not by the modification in the wall but by the poor workmanship by

___

11. As a result of the collapsed wall, the LaScolas claimed damages for blacktop repair, lost seed, lost fertilizer and lost stone. These items and the amount allotted for each are set forth in the trial court opinion under the heading "yard."

which it was constructed. This fact was inferentially conceded by Mr. Burdette and confirmed by a Mr. Mills who was qualified to testify as an expert witness in masonry contracting and construction.

Judge Mathias properly assessed damages for the collapse of the wall.

### III.

"Was the chancellor ... [wrong in] awarding cost-of-completion damages to owners in excess of the contract 'allowance' where builder of a residential dwelling fails fully to perform the construction contract? "

Appellant's challenge to the damages awarded is based on "two (2) propositions: (1) that the contract plans and specifications do not specifically locate the driveway; and (2) that the appellant-builder has been charged $3,667.21 for an item with a contract allowance of $1,000." [12] We will address these two challenges in the order presented.

Appellant's first contention "that the contract plans and specifications do not specifically locate the driveway" is not properly before us. Although the issue of the driveway was raised below, the question of the location of the driveway was not decided by the trial judge and, therefore, cannot be raised on appeal. Md. Rule 1085.

As to the second proposition, the amount of damages assessed, we also find no reversible error. The figure of $3,667.21 presented by appellants is misleading in that $773.10 [13] of that sum has already been accounted for in relation to the collapsed wall. By subtracting the $773.10 from

---

**12.** Additionally, appellant-surety "further alleges *if it is not liable* for the collapse of the retaining wall, then its liability for the driveway should not properly exceed the 'allowance.' " (Emphasis supplied.) Since this question is contingent on the surety's liability for the retaining wall, and inasmuch as we have held that appellant-surety is liable for the damages resulting from the collapse of the retaining wall, there is no need for us to address the second part of the third question.

**13.** This figure includes $500 for blacktop repair and $223.10 for lost stone.

the $3,667.21, the award is more accurately assessed as being $2,894.11. Admittedly, the cost is almost three times the $1,000 "allowance" called for in the contract.

The trial judge received testimony as to the cost and reasonableness of the amount claimed for completing the "driveway and entrance." The testimony included that of an expert witness in the field of home construction and home inspection. He testified as to the requirements for the driveway and entrance as set forth in the plans and specifications and the construction contract itself. Based on the evidence presented, Judge Mathias concluded that "[i]n order to get what they had contracted for, the LaScolas were put to considerable additional expenses and are entitled to damages itemized as follows [in pertinent part]:

*Yard*

| | | |
|---|---|---|
| Driveway grading and county apron | $ | 635.00 |
| Cement chunks | | 15.00 |
| Blacktop repair | | 500.00 |
| Drain tile | | 175.00 |
| Lost seed and fertilizer | | 25.00 |
| Lost stone | | 223.10 |
| . . . . | | . . . . |

*Labor Performed by Family ($5.00 per hour)*

| | |
|---|---|
| . . . . | . . . . |
| Driveway work | 1,096.25 |
| . . . . | . . . . |
| | $10,090.62" |

There is ample evidence in the record to support the factual conclusions of the trial judge. We cannot say he was clearly erroneous. Md. Rule 1086.

## IV.

"Was the chancellor ... [correct in] awarding to owners against the builder, the sum of $8,585.00 as 'reasonable attorney fees' and $1,535.00 for expert

witness fees authorized under the terms of the construction contract, where the cost-of-completion damages were $10,090.00? "

"The general rule is that, other than usual and ordinary court costs, the expenses of litigation—including legal fees incurred by the successful party—are not recoverable in an action for damages." (Citations omitted.) *Empire Realty Co. v. Fleisher,* 269 Md. 278, 285-86, 305 A. 2d 144, 148 (1973). An exception to that rule sanctions the award of attorney's fees under special circumstances, "as where the parties to a contract agree on the payment of attorney's fees." *Webster v. People's Loan, Savings & Deposit Bank,* 160 Md. 57, 152 A. 815 (1931).

The construction contract, in the instant case, provided:

"8. Should any dispute arise between the parties, owner or builder, respecting the true construction of the drawings or specification, or respecting the manner or sufficiency to the performance of the work, or should any dispute arise between the parties hereto respecting the valuation of extra work, work done or work omitted, the disputed matter shall be referred to and decided by two competent persons who are experts in the business of building, one to be selected by the owner and the other by the builder; and in case they cannot agree, these two shall elect a third arbitrator, and the decision of any two of them shall be binding on all parties. Provided, however, that the work shall not be interrupted or delayed pending such decision. *Should either party hereto bring suit in court to enforce the terms hereof, it is agreed that the losing party shall pay to the successful party his costs and reasonable attorney's fees.*" (Emphasis supplied.)

We interpret paragraph 8 of the contract as providing for the award of attorney's fees only in respect to enforcement, in court, of the arbitration. The underlined sentence refers to

the "terms hereof," *i.e.,* the provisions of that paragraph which only relate to the agreement to arbitrate. Inasmuch as arbitration was not undertaken, that contract provision does not apply.

Similarly, there is no basis for the award of expert witness fees. Such fees ordinarily are not recoverable from the unsuccessful party, *Freedman v. Seidler,* 233 Md. 39, 47, 194 A. 2d 778, 783 (1963), and there is nothing in the present case that justifies a departure from the ordinary.

## V.

In view of our decision with respect to the fourth question, we shall not discuss the fifth question raised by appellants, as it is no more than the fourth, revisited and rehashed.

Appellees, pursuant to Md. Rule 1036, have moved to dismiss the appeal on the ground that appellants have failed to comply with Md. Rule 1028. While the appellants' record extract is deficient, that deficiency has been corrected by the appellees' printing of an appendix in which the material missing from appellants' extract is supplied. *Kemp-Pontiac-Cadillac, Inc. v. S. & M. Construction Co.,* 33 Md. App. 516, 365 A. 2d 1021 (1976). We, therefore, deny the motion to dismiss.

> *Motion to dismiss denied.*
> *Judgment affirmed in part and reversed in part.*
> *Costs to be paid by appellants.*