CAROZZA ET UX. *v.* WILLIAMS ET AL.

[No. 103, October Term, 1947.]

144

*Decided March 17, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Michael Paul Smith* and *W. Albert Menchine*, with whom were *H. Lee Brill, Steward O. Day,* and *Smith & Barrett* on the brief, for the appellants.

*Robert D. Bartlett,* with whom was *Robert H. Archer* on the brief, for the appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal by plaintiffs from a judgment for them for $2,391.96, admitted by defendants to be due, in an action to recover $5,400 claimed by plaintiffs under a contract for the sale of dirt or "borrow" by plaintiffs to defendants. The case was tried without a jury.

By a contract dated April 24, 1942, plaintiffs agreed to sell to defendants dirt or "borrow" from a certain hill, to be dug and removed by defendants within eighty-two days, and defendants agreed within that period to dig and remove at least 90,000 cubic yards, in such a manner that the hill should be "left substantially smooth and regular and no deep and unsightly holes or depressions left unfilled and in an irregular condition." Defendants agreed to pay six cents ($.06) per cubic yard for all dirt or borrow dug and removed, in any event not less than $5,400, in monthly payments for yardage and the balance at the end of the eighty-two days if less than 90,000 cubic yards were actually dug and removed. The purpose of removing the dirt or borrow was to furnish "approved materials" for performance by defendants of a certain State Roads Commission contract in accordance with plans and specifications. "In the event the dirt or borrow should at any time be rejected by the State Roads Commission or its duly constituted engineers or other representatives, on the ground that" it "does not meet the requirements" of the commission as set forth in its plans and specifications, the right was reserved to defendants "to discon-

tinue digging and hauling away dirt or borrow" and the obligation of defendants to make payment therefor should extend "only to such yardage thereof as theretofore shall have been actually accepted by the Commission or its engineers or other duly constituted officials" for use in the construction of the road.

Defendants began digging on or before the date of the contract and discontinued on May 27 or 28, 1942. They dug and removed 39,866 cubic yards, for which they tendered payment of $2,391.96, but their check was returned. Plaintiffs claim $5,400. Defendants contend, and the lower court found, but plaintiffs deny, that plaintiffs' dirt or borrow was "rejected" by the State Roads Commission and defendants were therefore entitled to discontinue. This issue of fact is the substantial question presented on this appeal. On this issue plaintiffs and defendants each contend that their opponents have the burden of proof. We agree with the lower court that the facts are sufficiently presented to make the question of burden of proof unimportant. At this stage it is important that "the judgment of the trial court shall not be set aside on the evidence, unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Rules of Practice and Procedure, pt. 3, subd. 3, Trials, Rule 9.

Plaintiffs' witnesses were plaintiff himself, his son, and Mr. Nunn, former Construction Engineer for the State Roads Commission. Defendants' witnesses were one of defendants, their superintendent, Gott, their engineer, Baber, four State Roads Commission engineers, Robbins, French, Campbell and Heil, and its inspector Owens. The commission's inspector in charge of defendants' road contract, an engineer, Day, died before the trial. A diary kept by him contained an entry, dated May 27th or 28th, "Shut down borrow pit at 8 o'clock and moved to another location". The commission furnishes the engineer in charge of jobs a book for such records.

The commission's contract called for dirt of quality A-3 or better; the initial samples from plaintiffs' land were A-3 or better. Chemical tests are made at the laboratory, but engineers can tell pretty closely by inspection whether material is up to specifications. Several days before defendants discontinued they struck clay, which is lower quality than A-3, *viz.*, A-5 or A-7, and is unsuitable. The commission's engineers complained, and defendants had to move their steam shovel several times a day to find satisfactory dirt. Campbell, District Engineer, told Day "to be very careful in his inspection of the material that was going into the fill, and if it continued to be bad, as he had reported to me it was, he would have to shut down the work and not permit that type of material to go into the fill." The day before defendants discontinued, Day sent for French, whose duties were, among others, "to sample borrow pits". French says, "The material had been running bad, and I came out there and made several test holes. When I would find a good location, the shovel would be moved to that location—where the material would meet the specifications." The shovel was moved about five times in quest of good material. In some sections there was "right smart" of clay or Fuller's earth. Gott says, the day after French's visit "we hit more clay—we found it several times during the morning, at which time Mr. Day rejected this material for the right-of-way. Finally he came to the pit and closed down operations at that pit, as far as obtaining any more fill for the job was concerned". Defendant Williams says, before French's visit, "I kept moving the shovel around and around and then Mr. Day closed down the operations and said that we could not use any more borrow from this pit". When French came, "we did make other holes and we found other bad material. However, we did find two or three places where Mr. French thought we might get some good material. We tried the remaining place where Mr. French thought we might find some good borrow. Mr. French told us that, if that place

developed unsatisfactorily, we could not use this material. We tried it and it also developed unsatisfactorily. In the two or three remaining spots, the material was unsatisfactory for the fill, and Mr. Day again closed us down".

Some months after defendants discontinued digging on plaintiffs' land, the commission permitted a contractor, Langenfelder, to mix borrow from plaintiffs' land, where unsatisfactory soils "predominated", with satisfactory soil "so that the resultant combination of the two soils mixed" would satisfy the commission's requirements. Accordingly, Langenfelder did mix 104,471 cubic yards from plaintiffs' pit with 223,045 better borrow from other land. Nunn testified that after defendants discontinued there was acceptable dirt in plaintiffs' pit; this statement was based upon the fact that later dirt was taken from the pit and used on the Langenfelder job. At a former trial he testified that defendants "very defintely stopped because the material being excavated wasn't meeting specification and require- ments" and defendants then "had to find a source of supply that would give them acceptable material"; they had to go elsewhere. "The thought was" that the material from plaintiffs' pit "was not acceptable to be used alone but that, if it were mixed or combined with some other source," then "it would be satisfactory for use." Later he undertook to explain this testimony as meaning that the material that "wasn't meeting specifications" was "the material at that particular location within the area of the pit where the shovel was actually being operated." "There was no definite refusal [by the commission] to accept dirt from [plaintiffs' pit], but the various locations from which [defendants] were attempting to take the dirt, were proven to be unsatisfactory still."

Owens says that under the commission's rules, in case of disputes, the inspectors, *e. g.*, Day, have authority to reject the material, or suspend operations and refer the matter to the engineer, "the Chief Engineer, I would

say." The commission does not "condemn" anyone's land as unsuitable; it feels it cannot deny a contractor the right to use any suitable soils—even from land where unsuitable soils "predominate."

Plaintiffs earnestly contend that defendants have failed to sustain the burden of proof that the commission "rejected" plaintiffs' dirt as not meeting its requirements and that defendants were entitled to discontinue. Assuming, without deciding, that defendants have the burden of proof, the contention is untenable and is based on a distorted view of the contract and the evidence. Plaintiffs assert that defendants' real reason for discontinuing was to save money by getting another "borrow" pit (a) nearer the road work, since the new road, which began at plaintiffs' land, had been completed for a distance of about four miles and (b) containing more good dirt and therefore requiring less time to move about to find and dig suitable material. The former assertion raises a question of veracity, on which we see no reason to differ with the lower court—and indeed find no supporting evidence. The latter assertion involves construction of the contract, though in the abstract there seems to be little or no dispute as to construction.

The evidence indicates that most land contains good dirt and bad. Defendants were not entitled to discontinue merely because some dirt was bad and was "rejected" by the commission. On the other hand, they were not obligated to scour the surface—and the subsurface—of plaintiffs' land to locate and dig the last ton of good earth, regardless of cost or time to locate and dig small quantities at many places, as compared with large quantities at a few places. If this construction is not axiomatic, it is supported by the fact that plaintiffs' contract contains a time limit for performance (like most road construction contracts) and also the requirement that the surface "shall be left substantially smooth and regular and no deep and unsightly holes or depressions left unfilled and in an irregular condition." At

150

the argument it was stated that, in addition to the instant case, plaintiffs brought another suit against defendants for breach of this requirement and in that suit a verdict was directed for defendants. Fairly construed, the contract obligated defendants to continue only so long as there remained satisfactory dirt which could be located and dug in commercial quantities without abnormal expense in locating and digging petty quantities at scattered locations. *Cf. Williston, Contracts*, § 620, note 4. We agree with the lower court that the testimony—including Nunn's—is conclusive that defendants performed their obligations in this respect. They were under no obligation to dig unsatisfactory dirt, obtain dirt of superior quality elsewhere, and make a satisfactory mixture. We think the subsequent use of plaintiffs' dirt by Langenfelder supports defendants' position and does not support Nunn's testimony, so far as performance of defendants' contract is concerned.

Nor was any ritual of "rejection" necessary. The dirt was unsatisfactory, defendants knew it was unsatisfactory, it was Day's duty to reject it, he did reject it, and it continued so uniformly unsatisfactory that he "shut down" plaintiffs' borrow pit and defendants moved to another pit. There was no "dispute" to refer to the "engineer" and no duty on defendants' part to start a groundless dispute.

Plaintiffs also object to admission in evidence of the quoted statement in Day's diary and other statements by him. "Rejection" of unsatisfactory material by word of mouth, and other statements accompanying, and relating to, the performance of duties or other conduct of business, are not hearsay but are verbal acts and are admissible when relevant. In familiar, but somewhat loose, legal parlance they are part of the *res gestae* —verbal parts of an entire act. *McBriety v. Phillips*, 180 Md. 569, 576, 26 A. 2d 400. The testimony as to oral statements by Day is within this category. The statement in his diary adds nothing to the testimony

as to similar oral statements by him. It is, however, admissible, at common law as a statement by a disinterested person, now deceased, made in the regular course of business (*Reynolds v. Manning*, 15 Md. 510, 523), and by statute even if he were still living. Code, Art. 35, sec. 68.

*Judgment affirmed with costs.*