# MAYOR AND CITY COUNCIL OF BALTIMORE *v.* INDUSTRIAL ELECTRONICS, INC.

(Two Appeals in One Record)

[No. 80, September Term, 1962.]

*Decided December 11, 1962.*

The cause was argued before HENDERSON, HAMMOND, HORNEY, MARBURY and SYBERT, JJ.

*Vern J. Munger, Jr., Assistant City Solicitor of Baltimore,* with whom were *Francis B. Burch, City Solicitor,* and *George W. Baker, Jr., Deputy City Solicitor,* on the brief, for the appellant and cross-appellee.

*Franklin G. Allen,* with whom were *Piper & Marbury* on the brief, for the appellee and cross-appellant.

HAMMOND, J., delivered the opinion of the Court.

The Mayor and City Council of Baltimore (the City) ap-

peals from a judgment against it in a non-jury trial in which Industrial Electronics, Inc. (Electronics) recovered damages for cancellation by the City of contracts to supply and service two-way radio communication equipment for vehicles of the City's Department of Traffic and Transit. Judge Cullen held that the equipment had met the City's specifications but that Electronics had not fulfilled its obligations of maintenance and that the City had had the right to obtain proper maintenance and charge the cost thereof against the payments it owed Electronics under the contracts. Below and here the City claimed the right to cancel without liability for further payments, and Electronics said (in this Court in support of its cross-appeal) that there had been no breach of contract whatsoever by it, so that its damages were greater than those allowed by Judge Cullen.

In 1956 the City asked for bids on communication equipment to meet specifications prepared by the Electronic Maintenance Supervisor of the Department of Traffic and Transit. On January 9, 1957, the City accepted Electronics' bid to lease it the specified equipment for five years with maintenance for that period (one of two alternatives under the proposal) and the right in the City to purchase the entire system for $1.00 per unit at the end of the contract period. The rental was to be paid in sixty equal monthly instalments. The original agreement was for fifty-five two-way radios to be installed in vehicles of the Department of Traffic and Transit and equipment at two stationary bases for broadcasting to the vehicles. The City had the option to call for up to twenty additional radios. On October 2, 1957, the City purchased ten more radios under its option. On February 5, 1958, the City entered into another agreement with Electronics for fifteen more radios "as described in the original specifications." On May 1, 1958, the City again exercised its option and took ten radios, making a total of ninety it held under the terms of the original contract. The acceptance dates of the additional units ran from September 1957 through August 1959. On another occasion Henry Barnes, Director of the Department of Traffic and Transit, asked Electronics whether it would enter into another

contract for twenty-five more radios and another base station. It declined the invitation, and another firm supplied that equipment.

As equipment was delivered and installed by Electronics, the City accepted it and began the monthly payments. The total contract price, if the payments had been made for the full five-year period, would have amounted to $95,834.00. On March 21, 1960, the City cancelled the contracts on the ground of inadequate maintenance service, after it had paid $43,724.21 and owed a balance under the contracts of $52,109.79. The contracts consisted of the proposal, the specifications, and "the agreement." The agreement (dated January 9, 1956, but actually entered into on January 9, 1957) recited that a contract —"subject to all the conditions, covenants, stipulations, terms and provisions contained in the said specifications, and in a certain bid or proposal therefore, * * * in all respects made a part hereof, has recently been awarded to the contractor * * * at and for the lump sum price * * *." The proposal provided that if the successful bidder (the "contractor") abandoned his undertaking, or if the City thought performance of the contract was being "unnecessarily or unreasonably delayed," or that there was wilful violation "of any of the conditions of the specifications" or bad faith in their execution or if the execution was "not in accordance with the terms thereof," the City could "annul the contract or any part thereof * * *," and "thereupon have the power to contract for the completion of said work * * * and to charge the entire cost and expense thereof to the contractor * * * out of such monies as may be due or may become due to the contractor under and by virtue of the contract." If, in such case, the expense exceeded the amount due under the contract, the contractor or his surety "shall pay the amount of such excess to the City."

The specifications include these provisions: "It shall be understood that failure to comply with these terms may result in cancellation of the contract, and the supplier held responsible for all costs incurred because of the removal of equipment from the City's premises if the contract is cancelled or the City will charge back to the contractor any and all expenses

incurred by the City because of the contractor's failure to perform necessary maintenance."

Judge Cullen, although he did not spell out the reasons for his conclusions, evidently thought the rights of the City under the contracts and the circumstances of the case did not rise beyond obtaining adequate maintenance from others than Electronics (which was readily available) and charging the cost thereof against the amount it owed Electronics under the contracts. Accordingly, he determined that the cost to the City of obtaining proper maintenance for the ninety mobile units was $6.50 a month each and that for the fixed stations $30.00 a month each, or a total of $20,902.00 for the remaining life of the contract. Subtracting this amount from the unpaid rentals, as he found them, he arrived at $31,137.99 as the sum due Electronics by the City and entered judgment for that amount. We find no error.

Reaching Electronics' primary contention that there was no breach of the contract whatsoever, it appears to us that whether there was or not is a close question. The evidence would have permitted the conclusion that the real purpose of the City in cancelling the contract was to immediately obtain and use newer and better equipment which had become available after that covered by the contract—which apparently was, at the time it was installed, the best on the market—had been put into service. There was never a written complaint of inadequate service until the letter of cancellation. Further, until a meeting of December 29, 1959, attended by representatives of the City and of Electronics and their lawyers, the only complaints of the City were specific, infrequent and relatively unsubstantial rather than general, recurrent and grave. On three occasions over a period of years from the original contract of January 1957, the City acquired from Electronics thirty-five additional units on terms identical as to service with those of the original contract. On a fourth occasion, the Director of Traffic called on Electronics to supply twenty-five more units and a base station. These repeated dealings with Electronics would not appear to indicate a then current basic dissatisfaction with the service it was affording. Nevertheless we cannot say, as Electronics urges us to do, that in accepting the testi-

mony of officials and employees of the City as to inadequacy of service by Electronics Judge Cullen was clearly in error in holding, as he did, that Electronics had failed in its obligation of maintenance under the contracts.

We turn to consideration of the meaning of the contracts in a situation in which Electronics failed in a contractual obligation. The City argues that the contracts mean that any failure by Electronics to comply with any of their terms justifies cancellation no matter how harsh the consequences to Electronics. The rule to be applied is that an interpretation which makes a contract fair and reasonable will be preferred to one leading to a harsh or unreasonable result, so that a reading which produces a forfeiture will not be favored. WILLISTON ON CONTRACTS (3rd Ed.), Sec. 620; *Carozza v. Williams,* 190 Md. 143, 150.

A fair and reasonable interpretation of the provisions of the proposal and of the specifications, read together, is that if Electronics abandons its obligations under the contracts, or unnecessarily or unreasonably delays their performance, or wilfully violates any of the conditions of the specifications or executes the contracts, including the specifications, in bad faith or not in accordance with the terms thereof, the City "shall thereupon have the power" to cancel the contract, but, if it does, must, if reasonably possible, procure another to do that which Electronics failed to do, and pay the cost thereof, as far as possible, from the contract rentals then unpaid. *Jacob & Youngs v. Kent* (N. Y.), 129 N. E. 889, 891; *Krell v. Bovaird Supply Co.,* 83 F. 2d 414. Such a construction leads to a fair and reasonable result. The City gets what it bargained for, at no extra cost, because Electronics pays for the necessary maintenance either through contract rentals or, if they are not sufficient, from other of its funds or those of its surety.

So read, the contracts prepared by the City and used in this case embody the philosophy underlying the doctrine of substantial performance, and call for the result which would follow if we accepted Electronics' claim that the doctrine applies here. The doctrine is that before partial failure of performance of one contracting party will give the other a right to rescind,

the failure must go to the root of the contract or be in respect to matters which would render the performance of the rest a thing different in substance from that which was contracted for. *Speed v. Bailey,* 153 Md. 655, 660; *Evergreen Amusement Corp. v. Milstead,* 206 Md. 610; *Ady v. Jenkins,* 133 Md. 36; *Kahn v. Schleisner,* 165 Md. 106; WILLISTON ON CONTRACTS (Rev. Ed.), Sec. 841; *Restatement Contracts* Sec. 275.

Since we find that the terms of the contracts expressly require the City to do as the trial court found it must, we do not reach Electronics' contention that the doctrine of substantial performance should be applied.

The damages awarded were within the range the testimony permitted. The judgment appealed from will be affirmed.

*Judgment affirmed, with costs.*