The STOP & SHOP
COMPANIES, INC., et al.
v.
INDIAN HEAD HIGHWAY
ASSOCIATES, et al.

Civ. No. PN–88–2576.

United States District Court,
D. Maryland.

May 9, 1989.

Wilbur D. Preston, Jr., Gerard J. Gaeng, Mara Schechter and Whiteford, Taylor & Preston, Baltimore, Md., for plaintiffs.

Shale D. Stiller, Jay Morstein and Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for defendants.

## OPINION

NIEMEYER, District Judge.

Plaintiffs, who are assignees of two leases, have sued the defendant landlords on the leases for a declaratory judgment to determine their leasehold rights. This opinion will resolve the questions presented by plaintiffs' suit.

The defendant Indian Head Highway Associates, a Maryland partnership, is the landlord of a shopping center in Fort Washington, Maryland. It leased this property for thirty years to Memco, Inc., the original tenant, with the option to extend the lease for up to six successive five-year terms. Memco merged with Lucky Stores, Inc., and that entity assigned its leasehold rights to Stop & Shop Companies, Inc., one of the plaintiffs.

The defendant Route 606–Reston Associates, a Virginia partnership, is the landlord of a shopping center in Reston, Virginia. It similarly leased the property there for thirty years, with six five-year options to extend, to Memco, who again was the original tenant. After Memco's merger with Lucky Stores, the resulting entity likewise assigned its leasehold rights to Stop & Shop.

On June 14, 1988, Stop & Shop reassigned both leases to a subsidiary, Bradlees Washington/Baltimore, Inc., who is the other plaintiff in this action. When the landlords took the position that the assignments by Stop & Shop to Bradlees effected a forfeiture of certain options contained in the leases, Bradlees and Stop & Shop entered into an agreement to rescind their assignments or, alternatively, to reassign to Stop & Shop any leasehold rights Bradlees may have obtained.

Because the landlords have taken the position that the options in the leases were lost as a result of the assignments from Stop & Shop to Bradlees, Stop & Shop and Bradlees brought this declaratory judgment action to determine the status of the option rights under the leases. They have filed a motion for summary judgment, arguing that (1) the rescission of the assignments to Bradlees effectively restored the option rights to Stop & Shop and (2) that Stop & Shop never lost the option rights under the language of the leases and documents modifying the leases. The defendants filed a cross motion for summary judgment, contending that because of the assignments from Stop & Shop to Bradlees, Stop & Shop lost its option rights under the leases. The defendants also contend that if their position is not sustained, they should be allowed additional discovery to determine whether a further assignment from Stop & Shop or Bradlees to Hechinger's, Inc. resulted in a loss of option rights. Both parties seek attorneys' fees as provided by the leases to the prevailing party in the litigation.

## I.

Memco, the original tenant of the two properties involved in this case, became a tenant of the Reston property by lease

dated November 18, 1976, and a tenant of the Fort Washington property by lease dated April 14, 1980. Lucky Stores, a parent corporation of Memco, guaranteed Memco's performance under these leases. The original terms of these leases end in the years 2007 and 2011, respectively.

Each lease contains three options that are the subject of this litigation and which are generally referred to as "the option rights." Section 3 of each lease gives the tenant the option to extend the lease for six successive individual terms of five years each. Section 20 of each lease gives the tenant a right of first refusal. Finally, Section 31 of each lease gives the tenant the right to terminate the lease after a fixed term of years if, in the tenant's judgment, the property is no longer economically useful in the tenant's business.

The assignability of the leasehold rights and the options rights is governed by Section 13. The two leases contain similar rules with respect to assignments, but the Fort Washington lease is more permissive. Section 13 is reproduced below with the language in brackets appearing only in the Fort Washington lease:

Tenant shall have the right to sublet the demised premises or any part thereof. *Tenant shall also have the right to assign all of its rights and interests under this lease* provided Tenant is not in default hereunder; *provided that no assignee* [other than a parent, subsidiary or other affiliate of Tenant's guarantor hereunder] *shall have the right to exercise any option* to extend the term of this lease except as provided in Section 3 hereof nor shall any assignee of Tenant (other than Tenant as a reassignee [and other than a parent, subsidiary or other affiliate of Tenant's guarantor hereunder]) have the purchase rights granted to Tenant pursuant to Section 20 hereof or the right to terminate this lease pursuant to Section 31 hereof. In order to be effective, any such assignment must be consented to by the guarantor of this lease. *No such assignment or subletting shall relieve Tenant from any of its obligations as Tenant hereunder....* (Emphasis added.)

In January of 1983, Lucky Stores contacted the defendant landlords (who are limited partnerships with a common general partner) to discuss a planned reorganization under which Memco would merge into Lucky Stores and Lucky Stores as the resulting entity would assign its interest in the two leases to the plaintiff, Stop & Shop. On January 10, 1983, in exchange for $400,000, the defendants as landlords agreed that if Memco merged into Lucky Stores, Lucky Stores would obtain all of Memco's rights under the leases, including the options in Sections 3, 20 and 31, and that if Lucky Stores assigned its interest in the leases to Stop & Shop, Stop & Shop would likewise obtain these options. The consents signed by each defendant state in relevant part:

*notwithstanding the terms of the Lease, so long as the Assignment* [from Lucky to Stop & Shop] *is in effect, Assignee* [Stop & Shop] *shall have the right to exercise the options* to extend the term of the Lease pursuant to Section 3 thereof, Assignee shall have the purchase rights granted to the Tenant under the Lease pursuant to Section 20 thereof, and Assignee shall have the right to terminate the Lease pursuant to Section 31 thereof.... (Emphasis added.)

On January 14, 1983, Memco merged into Lucky Stores, and thereafter Lucky Stores assigned all of its interest in the two leases to Stop & Shop by assignments dated January 31, 1983. Paragraph 6 of the assignment of the Reston lease and paragraph 5 of the assignment of the Fort Washington lease are identical and read as follows:

This Assignment of Lease and Agreement shall inure to the benefit of and shall be binding upon the parties hereto, their successors, transferees and assigns; except that *the right to exercise the options* to extend the term of the Lease pursuant to Section 3 thereof, the purchase rights granted under Section 20 of the Lease and the right to terminate the Lease pursuant to Section 31 thereof *shall not inure to the benefit of any successor, transferee or assignee* unless otherwise expressly provided in the appli-

cable provisions of the Lease itself. (Emphasis added.)

In June, 1988, Stop & Shop transferred a number of its leases to its Bradlees subsidiary as part of a corporate reorganization. This reorganization included assignments on June 14 of the Reston and Fort Washington leases. The assignments of these leases state, in relevant part, "[Stop & Shop] hereby assigns and transfers all of its right, title and interest in, to and under the Lease to Assignee [Bradlees] ... subject and subordinate to all the terms, covenants and conditions of the Lease...." The defendants were notified of these assignments on June 17, 1988. While the plaintiffs contend in their papers that the assignments of these leases were inadvertent, the defendants contend that the assignments were intended, but that perhaps the notification of the landlords was inadvertent.

In letters dated June 28 and 29, 1988, the defendant landlords notified Stop & Shop that it was the defendants' position that as a result of the assignments of the leases, the lease terms would expire at the end of the initial thirty year term and that neither Stop & Shop nor Bradlees had the right to exercise any of the options contained in the leases. The defendants' letters stated:

[I]t is the Landlord's position that no such rights [option rights] are assignable by Stop & Shop and, accordingly, those rights, pursuant to the terms of the Lease, as amended ... have been terminated.

Accordingly, it is the position of [landlord] ... that neither the assignee nor any other party has any right to exercise any options....

Stop & Shop responded on July 8, 1988, that it had not intended to assign these leases. On August 25, 1988, Stop & Shop and Bradlees entered into an agreement in an attempt to reverse any effect the assignments of the leases may have had. The August 25 agreement: (1) declared the assignments void *ab initio*, (2) in the alternative, repudiated and revoked the assignments, and (3) further in the alternative, reassigned the leases from Bradlees to Stop & Shop.

## II.

The facts are not in dispute, at least not in any material way. The parties do disagree on whether the assignments by Stop & Shop to Bradlees were inadvertent. Whether they were inadvertent, however, is not material. There is no question that the assignments from Stop & Shop to Bradlees were made and that copies of the fully executed assignments were delivered to defendants prior to June 28, 1988. Not until July 8 did plaintiffs contend that the assignments were a mistake, which was only after they had notice of defendants' position described in the letters of June 28 and 29. Moreover, it was not until August 25, 1988, that they executed an instrument in an attempt to reverse what had been done.

There is also a suggestion that the undeveloped state of the record on an assignment by plaintiffs to Hechinger's, Inc. requires further development if defendants are unsuccessful on their cross motion for summary judgment. They urge that if the Court were inclined to enter summary judgment against the defendants, they should have the further opportunity to discover the circumstances of the transactions between plaintiffs and Hechinger's, Inc. because these transactions may further impact on whether the plaintiffs have lost any option rights.

A careful reading of the complaint reveals no suggestion of or reference to the Hechinger's transaction, and no counterclaim has been filed by the defendants on this transaction. Therefore, the Court does not believe that further discovery is necessary. While the Hechinger's transaction is not the subject of the current litigation, the Court feels confident that the application of the principles enunciated in this opinion would permit the parties to resolve any further disputes with respect to further assignments.

Disposition of the issues before the Court therefore may properly be accomplished by summary judgment.

### III.

For their first point plaintiffs argue that the Court need not consider the effect of the assignments to Bradlees because the August 25 agreement rendered them void *ab initio.*

Parties to a written contract have the right to rescind it by mutual consent, thereby abrogating it *ab initio. See, e.g., Vincent v. Palmer,* 179 Md. 365, 371, 19 A.2d 183 (1941). However, parties to a completed transaction cannot between themselves rescind the transaction once it has given legal rights to a third party. Plaintiffs' argument assumes that defendants acquired no rights from the assignments. They argue that because defendants were at best incidental beneficiaries of the assignments, they acquired no rights from them. *See Bolick v. Bd. of Ed. of Charles Co.,* 256 Md. 180, 260 A.2d 31 (1969). Without deciding whether defendants acquired any rights as an incidental third-party beneficiary of the assignments, such rights could have been acquired by defendants as a result of the assignments *under the expressed terms* of the leases and consents. If defendants did acquire rights from the assignments, then surely plaintiffs could not nullify these rights by rescinding the assignments as between themselves.

Thus, if the Court were to construe the leases in such a way that the tenant lost its option rights when it assigned the leases, then once the leases were assigned, a rescission of the assignments would not have restored the option rights without the consent of the landlords. If, on the other hand, the leases were to be construed in a manner that provides that the option rights were not assignable and therefore were not in fact assigned by a general assignment, the rescission between plaintiffs would be irrelevant. The proper interpretation of the leases, therefore, will govern the rights of the parties to this action, irrespective of the rescission agreement of August 25, 1988.

### IV.

Plaintiffs next urge that they never lost any options rights because under the terms of the leases and consents the rights were not assignable. Any attempt to assign the option rights, they argue, whether inadvertent or not, was ineffective, and there is no language in the documents that provides that if an attempt to assign is made, the rights are forfeited.

The defendants contend on the other hand that when Stop & Shop purported to assign "all its interest" in the leases to Bradlees, it lost its option rights because the leases did not permit these rights to be assigned. The argument is perhaps best stated that Stop & Shop voluntarily gave up all its rights, including its option rights, by its complete and unqualified assignment. Because Bradlees could not receive those rights under the terms of the lease, the rights were lost. Therefore, when Bradlees reassigned its interest back to Stop & Shop, it had no option rights to convey. Although the defendants have been unable to cite any case which provides that an assignment, without reservation, transfers not only that which is assignable but also causes a waiver of rights which are not assignable, the defendants have directed the Court to I. Friedman on Leases (2d Ed.1983), § 7.401 at pp. 281–82 and § 7.501C at p. 300; and *Italian Fisherman, Inc. v. Middlemas,* 313 Md. 156, 545 A.2d 1 (1988).

Those references support the notion that when all interest in a lease is transferred by assignment, the assignee steps into the lessee's shoes and acquires all the lessee's rights in the lease. When, however, an assignment conveys less than all the rights enjoyed by the assignor under a lease, it is construed as a sublease. Under a transfer by a sublease, a new lessor-lessee relationship is created and the original lessee retains both privity of estate and privy of contract. *Italian Fisherman, Inc. v. Middlemas,* 313 Md. at 163, 545 A.2d 1. The court there articulated the distinction between an assignment and a sublease:

> If the instrument purports to transfer the lessee's estate for the entire remainder of the term, it is an assignment, regardless of its form or of the parties' intention; however, if the instrument

purports to transfer the lessee's estate for less than the entire term—even for one day less—it is a sublease, regardless of its form or the parties' intention.

*Id.* at 164, 545 A.2d 1.

Whether the transfer is an assignment or a sublease, the terms of the operative documents in this case will govern the relationship between the parties.

The leases in this case provide that they are assignable provided that no assignee "shall have the right to exercise any option" (Section 13). The leases also provide that in the case that the lease is assigned, the assignor continues to be obliged to perform "tenant's" duties under the lease. When the landlords were paid $400,000 to permit Stop & Shop as an assignee to obtain the option rights, the consent form modified the base leases to provide that "notwithstanding the terms of the Lease, so long as the Assignment [from Lucky Stores to Stop & Shop] is in effect, [Stop & Shop] shall have the right to exercise the options...." Moreover, the actual assignments from Lucky Stores to Stop & Shop provided that Lucky Stores had the right to exercise the options but that the rights did not "inure to the benefit of any successor, transferee or assignee...." The interpretation urged by the landlords—that if an assignment were attempted, the option rights would be forfeited—is not supported by the language. Nowhere in the leases or consents is any assignment prohibited or declared to constitute a breach or, more particularly, to effect a forfeiture of rights given by the leases. Rather, the language of the leases expressly provides that leasehold rights are assignable, exempting only the option rights.

Thus, there is no dispute in this case that as a result of the consents entered into, Stop & Shop owned the option rights under both leases and that those rights were valuable rights, representing a negotiated value of $400,000. Moreover, it is agreed that the option rights that were purchased by Stop & Shop were not assignable.

An unqualified assignment generally operates to transfer to the assignee all of the right, title and interest of the assignor in the subject of the assignment. *James v. Goldberg,* 256 Md. 520, 261 A.2d 753 (1970). However, it is equally well-established that an assignor cannot assign that which he does not have to assign. In this case Stop & Shop did not have any assignable option rights and therefore the general assignments of June 14, 1988 from Stop & Shop to Bradlees could not convey such rights. When Stop & Shop assigned all its interest to Bradlees, assignments which were permitted by the lease, Bradlees received no option rights because Stop & Shop did not have the right to assign those option rights.

Not only did Stop & Shop retain its option rights, which were not assignable, but it also retained obligations of performance as a tenant, which were expressly not delegable. It can very well be urged, therefore, that under the analysis given by the court in *Italian Fisherman, Inc. v. Middlemas, supra,* the transfers from Stop & Shop to Bradlees, not having conveyed all of Stop & Shop's interest in the leases, were not assignments but rather subleases. Irrespective of the nature of the transfer, however, no language in any of the documents suggests that the assignments by Stop & Shop to Bradlees effected a termination or a forfeiture of the option rights.

Were Stop & Shop to have sublet the premises for three years only, reserving the remainder of the thirty-year lease as well as all option rights, would such a transfer have violated the leases or effected a forfeiture of the option rights? As defense counsel conceded at oral argument, no language supports such an interpretation. The Court sees no legal distinction between that hypothetical and the instant case if, as the Court has concluded, the option rights were inalienable and therefore were not assigned.

■ The landlords suggest that because the assignments to Bradlees were unqualified and did not reserve the option rights, Stop & Shop thereby relinquished those rights, and because Bradlees could not receive them under the terms of the lease, the rights were somehow lost in the transfer process. As discussed above, such an in-

terpretation assumes that Stop & Shop assigned away that which it could not assign. More importantly, such an interpretation would bring about a forfeiture of valuable rights by inference. In the absence of expressed language that reveals an intent by the parties to effect such a forfeiture, the Court should not infer it. The law abhors a forfeiture; even when one is expressed as a sanction in a lease, it will be strictly construed. Judge Soper applied this principle to leases in *Galvin v. Southern Hotel Corp.*, 154 F.2d 970, 973 (4th Cir.1946), where he stated:

[I]t is true that the lease contained provisions for forfeiture in case of the lessee's default in any covenant. But every violation of a contract containing forfeiture provisions does not necessarily require an actual forfeiture of the defaulting party's rights, and we think that in the present case especially persuasive circumstances are found for the application of the settled principle of both law and equity that contractual provisions for forfeiture are looked upon with disfavor, and will not be enforced if the result of a forfeiture will be unconscionable.

The rule is no different under Maryland law. As was said in *Baltimore City v. Industrial Electronics, Inc.*, 230 Md. 224, 229, 186 A.2d 469 (1962):

The rule to be applied is that an interpretation which makes a contract fair and reasonable will be preferred to one leading to a harsh or unreasonable result, so that a reading which produces a forfeiture will not be favored. WILLISTON ON CONTRACTS (3rd Ed.), Sec. 620; *Carozza v. Williams*, 190 Md. 143, 150 [57 A.2d 782].

A forfeiture is a harsh sanction which will be imposed only if it was clearly the intent of the contracting parties to do so. Quite rationally, therefore, unless the forfeiture of a right or interest is explicitly provided by clear language, it will not be inferred.

In *202 Marketplace v. Evans Products Co.*, 824 F.2d 1363 (3d Cir.1987), the landlord contended that because the lease in question there described specific uses to which the *demised* premises could be put,

the tenant therefore agreed "tacitly" not to use *common areas* for those uses. The landlord concluded that the use of common areas for those purposes which were specifically assigned to the *demised* premises constituted a breach of covenant thereby effecting a forfeiture of leasehold rights. Applying Pennsylvania law, which endorses the same principles generally applicable in Maryland and elsewhere, the court stated:

We do not believe that the rule of construction in Pennsylvania permits the conversion of a demise into a covenant by negative inference in order to sustain a forfeiture. "Forfeitures are odious in law, and are enforced only when there is the clearest evidence that that was what was meant by the stipulations of the parties." *Cleveland v. Salwen*, 292 Pa. [427] at 433, 141 A. [155] at 157 [ (1928) ].

*Id.* at 1367. The landlord also urged that a lease provision imposing on it the duty not to permit tenants to put up certain exterior advertising constituted an implied covenant by the tenant not to do so. The court again refused to impose a forfeiture against the tenant which had painted exterior advertising. The court said:

This language does not constitute a covenant by Evans Products to refrain from painting the exterior of the building. It contains an express promise by the landlord for the benefit of all tenants and, as such, would require us to derive an implied promise on the part of the appellant. We cannot sustain a forfeiture on the basis of an implied covenant.

*Id.* at 1368.

■ Thus, in the instant case, the landlords' contention that the forfeiture should be inferred from the attempted assignment of rights that were not assignable violates the well-established principle that forfeitures are disfavored and will not be imposed on the basis of an implied provision. The landlords were paid $400,000 so that Stop & Shop would have the option to extend the leases and to exercise the other rights. These valuable rights will not by inference be forfeited.

The landlords suggest that the $400,000 was paid by Lucky Stores and not by Stop

& Shop. While it is true that the checks written to the landlords were from Lucky Stores, who was the tenant, the entire purpose for the purchase of consents from the landlord was to place the option rights in Stop & Shop. Presumably, the deal between Stop & Shop and Lucky Stores reflected the fact that Lucky Stores had paid $400,000 for rights which would benefit Stop & Shop.

Landlords also contend that the loss of one of the option rights, i.e., the option to extend the leases, is inferred from the language of Section 13 of the leases. The operative provisions read:

> [N]o assignee shall have the right to exercise any option to extend the term of this lease except as provided in Section 3 hereof nor shall any assignee of tenant (*other than tenant as a reassignee*) have the purchase rights granted to Tenant pursuant to Section 20 hereof or the right to terminate this lease pursuant to Section 31 hereof. (Emphasis added.)

The landlords argue that because the two options, other than the option to extend, are assured to the tenant *on reassignment*, by negative inference the option to extend is not enjoyed by the tenant when it is a reassignee. They argue that when the leases were assigned to Bradlees and reassigned by Bradlees back to Stop & Shop, this negative inference caused a loss of the option to extend the leases.

In response, the plaintiffs argue that the negative inference is inapplicable because they never assigned their option rights, and thus there never was a reassignment of those rights. Moreover, they allege that the consents by the landlords that were purchased for $400,000 modified the language of Section 13 of the leases by giving to Stop & Shop an unqualified right to possess the option rights "so long as the assignment was in effect." They point to the consents from the landlords to Stop & Shop which provide, in pertinent part:

> [N]otwithstanding the terms of the Lease, so long as the Assignment is in effect, Assignee shall have the right to exercise the options....

The Court agrees with both of plaintiffs' responses. First, if, as the Court has held, the option to extend was never transferred to Bradlees, then it was never reassigned to Stop & Shop, and the negative inference is indeed inapplicable. Second, the plain and unambiguous language of the consent by the landlords makes clear that Stop & Shop retains the option rights so long as the assignment is in effect. There is no evidence in the record to suggest that the assignments from Lucky Stores to Stop & Shop were not still in effect. In sum, the interpretation of Section 13 that is advanced by the landlords is not supported by the language of the consents that they executed, and more importantly, it violates the principle that a forfeiture of valuable rights will not be implied from a negative inference.

Finally, the defendants claim in an affidavit filed with the Court that it was their intent that any transfer of the leases by Stop & Shop would extinguish Stop & Shop's option rights. The Court, however, may not consider defendants' affidavit relating to their subjective intent. The Court "must determine the intentions of the parties from the language of the contract itself, not by what a party to the contract intended it to mean, or thought it meant, but what a reasonable person in a position of the parties would have thought it meant." *James v. Goldberg,* 256 Md. 520, 527, 261 A.2d 753 (1970).

The fair and reasonable interpretation of the language of the leases, the consents, and the assignments suggests that the parties intended to give Stop & Shop the valuable option rights under the leases which were purchased from the defendant landlords for $400,000. If, at the time that these parties were negotiating for the transfer of these rights to Stop & Shop, one were to suggest to the parties that Stop & Shop could forfeit its rights if it purported to assign them, the Court firmly believes that none of the parties would have agreed with such an interpretation. In the absence of express language, the Court will favor an interpretation that makes the contract fair and reasonable over one that leads to such a harsh result,

i.e., one that effects a forfeiture of valuable option rights. *See City of Baltimore v. Industrial Electronics, Inc.*, 230 Md. 224, 229, 186 A.2d 469 (1962); Williston on Contracts (3d Ed.) § 620.

For the foregoing reasons, the Court will grant plaintiffs' motion for summary judgment, will deny defendants' cross motion for summary judgment, and will enter a declaratory judgment that determines that Stop & Shop has not lost its option rights by reason of the assignments from Stop & Shop to Bradlees dated June 14, 1988, and the conditional reassignments dated August 25, 1988.

## V.

Section 21 of each lease provides, "Landlord shall pay Tenant's reasonable attorney's fees and costs ... if ... Tenant commences an action against Landlord and is successful therein...." There is similar language in that section that provides that the reverse would be true if the tenants were unsuccessful. Both parties urge the applicability of these provisions to contend that the successful party in this case should be awarded attorney's fees. Where parties to a contract agree on the payment of attorney's fees, the courts will enforce the parties' agreement. *See Webster v. People's Loan, Savings & Deposit Bank*, 160 Md. 57, 61, 152 A. 815 (1931); *Burdette v. La Scola*, 40 Md.App. 720, 735, 395 A.2d 169 (1978).

Because plaintiffs commenced this action and were successful, this Court will award plaintiffs costs and reasonable attorney's fees.

A separate judgment giving effect to this opinion will be entered.